Matter of Nathanael E. (Melodi F.) (2018 NY Slip Op 02377)





Matter of Nathanael E. (Melodi F.)


2018 NY Slip Op 02377


Decided on April 5, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 5, 2018

524374

[*1]In the Matter of NATHANAEL E., Alleged to be a Neglected Child. BROOME COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; MELODI F. et al., Appellants.

Calendar Date: February 20, 2018

Before: Egan Jr., J.P., Lynch, Mulvey, Aarons and Pritzker, JJ.


Lisa K. Miller, McGraw, for Melodi F., appellant.
Alena E. Van Tull, Binghamton, for Brian E., appellant.
Thomas P. Coulson, Broome County Department of Social Services, Binghamton, for respondent.
David T. Spector, Endicott, attorney for the child.


Pritzker, J.

MEMORANDUM AND ORDER
Appeals from two orders of the Family Court of Broome County (Connerton, J.), entered January 18, 2017 and February 9, 2017, which granted petitioner's application, in a proceeding pursuant to Family Ct Act article 10, to adjudicate the subject child to be neglected.
Respondent Melodi F. (hereinafter the mother) and
respondent Brian E. (hereinafter the father) are the parents of two children (born in 2011 and 2015), the youngest of which is the subject of this proceeding (hereinafter the subject child). In March 2016, petitioner filed a neglect petition against respondents as a result of a head injury sustained by the subject child and their subsequent delay in seeking medical care for said injury. After a fact-finding hearing, Family Court issued two orders adjudicating the subject child to be neglected. Respondents now appeal from both orders.
"'[A] party seeking to establish neglect must show, by a preponderance of the evidence, first, that a child's physical, mental or emotional condition has been impaired or is in imminent [*2]danger of becoming impaired and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship'" (Matter of Alyssa OO. [Andrew PP.], 68 AD3d 1158, 1159 [2009], quoting Nicholson v Scoppetta, 3 NY3d 357, 368 [2004]; see Family Ct Act § 1012 [f] [i]). "When determining whether a parent or guardian has failed to exercise a minimum degree of care, the relevant inquiry is whether a reasonable and prudent parent would have so acted, or failed to act, under the circumstances" (Matter of Cori XX. [Michael XX.], 145 AD3d 1207, 1208 [2016] [internal quotation marks and citations omitted]). Family Court's factual findings and credibility determinations are accorded great weight in such a proceeding and will not be disturbed on appeal unless they lack a sound and substantial basis in the record (see Matter of Emmanuel J. [Maximus L.], 149 AD3d 1292, 1294 [2017]; Matter of Cori XX. [Michael XX.], 145 AD3d at 1208).
We find that there was a sound and substantial basis in the record for Family Court to conclude that respondents' failure to seek appropriate medical care after the subject child suffered a head injury constituted neglect. Petitioner's caseworker testified that, after receiving a report from the State Central Register of Child Abuse and Maltreatment regarding allegations not related to the subject child's fall, she visited respondents' home and observed a bruise, two inches wide, on the subject child's head. The mother informed the caseworker that, on the day prior, the subject child fell to the side while in his bouncy chair and hit his head on the floor. The mother initially misrepresented to the caseworker that she had already taken the subject child to the doctor, but, upon further questioning, the mother revealed that the subject child had a previously scheduled appointment later in the week. The caseworker left respondents' home with the understanding that the mother would take the subject child to a walk-in clinic as soon as the father returned home and that the caseworker would follow up with respondents later that afternoon to ensure that the subject child received medical care. Later that afternoon, the caseworker returned to respondents' home and was informed by the father, who had returned home, that he needed to rest prior to taking the subject child to the clinic. The father explained to the caseworker that the mother informed him of the incident and that the subject child appeared to be acting normally and that they were "monitoring" him. That evening, the father transported the subject child and the mother to the clinic, at which time it was advised that the subject child should receive additional testing at the hospital. While CT scans and X rays conducted at the hospital were "negative," and no other treatment was provided, the subject child was ultimately admitted and stayed in the hospital for three days.
The emergency physician who examined the subject child upon his arrival to the emergency room testified that she observed a "three-centimeter-area of deep erythema to the right frontal region." She explained that she has sent many infants with bruising to the head for specialty care and has filed neglect reports as to such injuries. The physician testified that the bruising she observed on the subject child's head was not consistent with the fall as it was described to her. The physician also testified that the subject child was "very small" for his age, which led to his admittance into the hospital for "failure to thrive," coupled with the concern as to how he was injured. In her opinion, although the subject child did not have any impairment from this injury, she believed that he should have received immediate medical attention because his "significant" bruise could have been a sign of a serious injury.
The mother testified that the subject child was born six weeks early and spent a month in the hospital before going home. She testified that, prior to the child's fall in his bouncy chair, she thought that she had secured him properly in the chair before briefly leaving the room. She further testified that, from the other room, she heard the subject child cry and immediately ran to him, finding him slumped over having bumped his head on the hardwood floor and crying; she [*3]observed a "slight" bruise, which she immediately put ice on. The mother further testified that, when the accident occurred, the father was at the gym; when he returned home, she informed him of the subject child's fall. After the father picked up the subject child to make sure that he was not hurt, both the father and the mother decided to monitor him at home. Testimony revealed that the subject child was covered under the father's health insurance. The mother further testified that she has been a certified nurse assistant for 11 years, the training for which was a six-month program, and that she works with the elderly. She testified that she utilized her professional skills to determine whether the subject child was seriously injured, including staying up with him throughout the night to observe him for any seizures or loss of consciousness. During this overnight period, the bruising became darker, but the subject child did not have any other issues, such as vomiting, constipation or diarrhea. The mother testified that the bruise was the size of a quarter, but photographs of the subject child's injuries that were admitted into evidence showed a pronounced, large reddish bruise to the upper right portion of his head.
The father testified that after he arrived home and the mother informed him of the incident, he monitored the subject child's injury and behavior, which did not change. The father explained that he has a Bachelor's degree in business management and works at a state agency as a developmental disability secure treatment aide, where he is trained to "monitor medically frail individuals." The father also testified that, despite the subject child's bruise appearing larger and darker the morning after the incident, he felt that he was "competent enough" to determine whether the subject child was acting abnormally.
Family Court determined that the mother's testimony was credible and, after observing the subject child's bouncy chair, ultimately found that the injury was not a result of neglect
because "accidents can happen with young children." However, Family Court also found that petitioner proved by a preponderance of the evidence that respondents neglected the subject child because they failed to seek appropriate medical care after he sustained the head injury. Here, respondents attempted to utilize their limited medical background to justify that their monitoring of the subject child's injury was sufficient. However, given the subject child's premature and underweight status, injury to the head and significant presentation of bruising, the subject child was in immediate danger of becoming impaired. Although the subject child was not ultimately impaired, "a child can be declared to be neglected as a result of the failure of the parent to act when the parent knew or should have known of circumstances which required action in order to avoid actual or potential impairment of the child" (Matter of David II., 49 AD3d 1093, 1094 [2008] [internal quotation marks, brackets and citation omitted]). Under these circumstances, a reasonable and prudent parent would have sought medical treatment, especially once the injury appeared to worsen in size and color (see generally Matter of Mary YY. [Albert YY.], 108 AD3d 803, 804-805 [2013], lv denied 21 NY3d 865 [2013]; Matter of Seamus K., 33 AD3d 1030, 1035 [2006]). Therefore, we discern no basis upon which to disturb Family Court's finding of neglect (see Matter of Josephine BB. [Rosetta BB.], 114 AD3d 1096, 1100 [2014]).
Egan Jr., J.P., Lynch, Mulvey and Aarons, JJ., concur.
ORDERED that the orders are affirmed, without costs.